Filed 2/27/25  Creal v. Nasiri CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KENNETH L. CREAL et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> AMITISS NASIRI, <br><br> Defendant and Appellant. | B322023, B325879 <br><br> (Los Angeles County Super. Ct. No. YC072653) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County.  Deirdre H. Hill, Judge.  Affirmed.

John L. Dodd & Associates and John L. Dodd for Defendant and Appellant.

De Castro & Morrow, David M. De Castro, and Arthur D. Morrow for Plaintiffs and Respondents.

Appellant and defendant Amitiss Nasiri appeals from a judgment after bench trial in which respondents and plaintiffs Kenneth L. Creal and his accounting firm Kenneth L. Creal, An Accountancy Corporation, prevailed on their causes of action for defamation.  Creal's lawsuit stemmed from various online statements posted by Nasiri on the websites Yelp and RipOff Report.  The trial court awarded Creal $1,598,000 in damages, consisting of lost profits, general damages, and punitive damages.  Nasiri also appeals from the trial court's postjudgment orders, denying her motion for new trial on the issue of punitive damages and granting Creal $358,365 in attorney fees.

On appeal, Nasiri argues the trial court erred when it issued evidentiary sanctions after her counsel failed to file certain pretrial documents.  She also argues the damage award was not supported by substantial evidence and that Creal should have been precluded from recovering lost profits as they were too speculative and remote.  She also claims Creal failed to establish he was entitled to general damages as Creal offered no evidence that he suffered any serious physical or emotional harm as a result of her posts.  Nasiri also claims that the award of punitive damages was based on speculative hearsay, and that she was entitled to a new trial on punitive damages after new evidence of her net worth became available.  Last, Nasiri argues the attorney fee award must be reversed because she had reasonable grounds to deny Creal's requests for admission during discovery.

For the reasons stated below, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Creal's first amended complaint alleged four causes of action:  (1) defamation per se; (2) defamation per quod; (3) trade libel; and (4) intentional interference with prospective economic

2

advantage. Creal alleged that Nasiri published false and defamatory statements on the internet when she posted numerous online reviews on the website Yelp. The trial court conducted a two-phase bench trial, bifurcating the issue of punitive damages.

## I.    Creal's evidence

Creal is a certified public accountant (CPA). He has been a practicing CPA since 1978 and operates an accountancy firm in Torrance under the name Creal & Creal, An Accountancy Corporation. Creal's business consists primarily of preparing individual tax returns, business tax returns, and litigation support.

Creal's daughter, Kimberly Creal, is also a CPA and a shareholder in Creal's firm. Creal's daughter is the third generation of accountants in the Creal family, which began with Creal's parents opening an accounting business in Hawthorne in 1956. Additionally, both of Creal's brothers were accountants who worked with Creal until Creal opened his own firm in 1982.

Creal maintained a website for his firm for 20 years but did not generally advertise as most of his new clients were referrals from existing clients. While Creal's firm had a webpage on Yelp, Creal did not create the page but merely confirmed with Yelp that the firm was his. He could not delete the Yelp page or modify any of the Yelp reviews. Creal believed newly referred clients would check Yelp for reviews. His daughter generally oversaw and monitored the firm's Yelp page.

In June 2015, Creal was retained as an expert by Nasiri's ex-husband, Mohamadali Abolahrar, in the dissolution case between Abolahrar and Nasiri. Although originally retained as an expert, Creal also filed an amended tax return for Abolahrar

after learning there was an Internal Revenue Service (IRS) tax credit for $65,000 for 2013.  To claim the tax credit, Creal filed a married-filing-separately return for Abolahrar in March 2017, claiming half the credit for Abolahrar, believing the tax credit was a community property interest.  Despite only claiming half the credit, the IRS refunded the entire amount to Abolahrar.

On October 26, 2017, Abolahrar's family law attorney asked Creal to pick up Abolahrar's laptop from Nasiri's family law attorney, Nadine Jett.  Creal went to Jett's office and informed the receptionist that he was there for the laptop.  While he waited in the reception area, Nasiri walked in and spoke to the receptionist.  Creal did not interact with Nasiri in the office, and left once he received the laptop.

After Creal left Jett's office, he noticed a Porsche parked in the parking area and believed it belonged to Nasiri.  Believing the Porsche was a community property asset, Creal photographed the vehicle.  As Creal was taking the photos, Nasiri came outside and told him, " 'You cannot do that.' "  Creal replied, " 'Yes, I can. It's in a public place.' "  Creal noticed Nasiri had her cell phone camera pointed at him, so he took a picture of Nasiri.

On October 26, 2017, Nasiri posted a one-star review on Creal's Yelp page.  The posting read:  "I would give him zero if I could.  My tax return was Manipulated and $69000 was refunded from IRS without my consent to my convicted felon ex husband who is out on bail.  Which I heard Mr. Creal took 20% of that since he was the accountant.  That's fraud.  He also has been the accountant for 2 businesses that I have interest in.  He has been helping in creating unreported income for the two businesses and has been making a mess as a professional.  This man followed me today to my attorney[']s office and I think he was damaging and

4

touching my car.  I stepped out and told him that he does not have a right to do so.  Please see attached pictures.  I also have full video.  Later I found out he also was actually covering the cameras in order to hurt me.  I made a police report and I will file a complaint.  Just stay away from this man.  And you will stay away from IRS investigations."

Creal learned of the review one month later when his daughter brought it to his attention.  He contacted Yelp to take down the review but Yelp refused because it appeared Nasiri had "consumer experience."  Creal knew he could reply to the review, but was concerned Nasiri would respond to his reply, exacerbating matters.

In the subsequent months, Nasiri made similar posts about Creal on the internet.  In five of these posts, she included a redacted federal criminal judgment along with captions that read "Convicted felons for conspiracy and fraud."  In another post that included a photo of Creal on the day he had the interaction with Nasiri at Jett's office, Nasiri claimed, "Creal is trying to [d]amage and touch my car."  Nasiri also posted comments about Creal on the website RipOff Report, stating Creal committed fraud, theft, and harassed Nasiri.

Creal believed Nasiri's internet posts would "kill" his work as an expert, deterring newly referred clients who searched his name on the internet.  Creal explained the situation with Nasiri in several depositions in other cases where he was retained in 2018 and 2019.  Creal felt obligated to give advanced notice to those parties who retained him as an expert just in case the issue with Nasiri came up at deposition.

In December 2017, Creal retained an attorney to contact Nasiri and request that she remove the Yelp review.  Creal wrote

to Jett, demanding Nasiri remove the Yelp review. On January 10, 2018, Nasiri posted a redacted version of the letter on Yelp with a caption that read: "Hilarious, bullying me to hide the truth." She posted again on January 22, 2018, claiming Creal hired "an attorney to harass" her. Creal did not respond to these posts, and directed his attorney to file a complaint.

In discovery obtained from Yelp, Creal learned that another negative review on his Yelp page posted by someone identified as "Pablo A" was connected to an e-mail address associated with a person who had worked for Nasiri. The post read: "I had a consultation with this firm. My friend referred me to Kenneth Creal. After two months he wanted 50% of the cash for the service to make everything 'his way.' I don't really know why he has 4 people who gave him 5 stars they're probably people who are related to him. I could just say he has a shady business and he's very unethical."

Creal was shocked when he saw Nasiri's posts on Yelp because they were false and implied criminal conduct. Creal was particularly concerned about the posts that alleged criminal conduct, stating: "If people believe that, I've been in this community for 40 years. I was born in Hawthorne with the family businesses that we've had. I'm known in my church affiliations. I'm known by thousands of people. Anybody reading this wouldn't touch me with a 10-foot pole. They wouldn't come to me professionally. And understanding how the Internet works, this would be up on the Internet for the rest of my life." Creal described the posts as "humiliating."

Creal described the financial condition of his firm the five years prior to Nasiri's posts. He provided tax returns and financial statements from 2012 to 2018. The revenue for the firm

in 2012 was $909,691, which grew every year until 2018 when it was $1,582,630. After Nasiri's posts through 2019, Creal's firm had almost no growth. In addition to Creal's tax returns, this pattern was reflected in Creal's records with respect to onboarding new clients, which saw a significant decrease after Nasiri's posts.

Nasiri eventually took down the original Yelp review after her deposition was taken in this case on February 4, 2019.

Creal called Nasiri as an adverse witness under Evidence Code section 776. Nasiri is a practicing dentist with dental practices in Santa Ana and Beverly Hills.

Nasiri admitted she wrote the October 26, 2017 Yelp review, as well as other posts on Yelp and Ripoff Report. She also admitted that she posted the pictures associated with those reviews. Nasiri admitted she never contracted with or personally hired Creal. While Nasiri maintained that Creal "manipulated" her tax return, she never produced the tax return that Creal allegedly manipulated. Nasiri claimed she heard Creal took a 20 percent fee but did not know one way or the other if he actually did or not. She also admitted that she did not investigate this claim before posting it. Nasiri never saw Creal damage her car, and gave conflicting testimony during discovery and at trial with respect to whether Creal touched or scratched her car. Nasiri never saw Creal at her home or work. Nasiri admitted the redacted federal criminal judgment she posted had nothing to do with Creal.

Creal called two expert witnesses, Kim Onisko and Henri Isenberg.

Onisko was a CPA with certifications in financial forensics, fraud examination, and business evaluation. Onisko testified a

significant portion of a CPA's new business comes from social media and the internet. She opined that posts like Nasiri's would be "disastrous" for a firm like Creal's.

Onisko evaluated the potential harm Nasiri's posts had on Creal's business by looking at Creal's tax returns. Onisko noted that Creal's firm grew at an average rate of 11.7 percent a year for the five years prior to Nasiri's posts. Onisko used a five-year average to approximate Creal's firm's yearly average growth. She found in the two years after Nasiri's posts, the firm only grew 0.3 percent. After taking into account other outside factors like the strength of the economy, the growth of other accountancy firms in the same period, and the specific parameters of Creal's firm, Onisko opined the firm's growth stalled as a result of Nasiri's posts.

Onisko opined that had Creal's firm had continued to grow at the same historic rate, it would have generated additional revenue of $180,228 in 2018 and $371,094 in 2019. Onisko confirmed that a 90 percent client retention rate was consistent in the industry. Based on that retention rate, Onisko testified that the revenue Creal should have earned in 2018 and 2019 would have continued into the future through 2028, but declined each year by 10 percent. Onisko calculated past damages at $345,128 and future damages at $973,082, totaling $1,318,210.

Henri Isenberg testified as an expert in online reputation. He testified Nasiri's posts were visible to anyone searching the internet for Creal because the Yelp page generally appeared as a top search result on various search engines. Further, "snippets" from the Yelp reviews could be seen directly on the search engine. He opined that approximately 63 people per month were visiting Creal's Yelp page between 2017 and 2019. Isenberg testified that

someone could easily find Nasiri's Yelp reviews if he or she searched Creal's name. He opined the increasing number of individuals searching for Creal's name online during the time while Nasiri's posts were visible and the corresponding stall in the growth of Creal's business and new client acquisition were evidence that Nasiri's negative reviews caused a decline in business.

## II. Nasiri's evidence

Nasiri called two expert witnesses in accounting and public relations.

Robert Farias was a CPA. He opined Creal suffered no economic damages. Farias opined the data provided by Creal regarding lost profits was incomplete and that there was no way to distinguish between the effect of Nasiri's posts and other factors such as trends in the economy, changes in the law, the demand for expert testimony, and new employees. For example, Farias testified it would be difficult to tell from only the profit and loss statements how many hours were actually billed by Creal's firm or what its billing rates were.

Robert Fisher operated his own public relations firm and had been qualified as a public relations expert. Fisher was familiar with Yelp and explained that Yelp makes it easy for business to respond to negative reviews. He opined that businesses should respond to negative Yelp reviews, and that Creal should have responded to Nasiri's reviews to "correct the record."

Although the trial court did not issue any initial findings on liability, it indicated to the parties it would be moving to the punitive damage phase.

## III.  Punitive damages

Creal called Nasiri as a witness and introduced documents from Nasiri's family law case to demonstrate Nasiri's net worth. This included schedules of assets and debts signed by Nasiri on February 27, 2017 and on January 15, 2021.  In the 2017 schedule, Nasiri listed $13,238,050.50 in community and separate property assets and $1,380,720 as the amount of money owed or encumbered.  In the 2021 schedule, Nasiri listed $4,626,942 in community and separate assets and $6,334,546 as the amount of money owed or encumbered.

Nasiri testified that she believed a home located on Roanwood Drive was community property although Abolahrar was claiming it was his separate property.  She estimated the value of the property in 2021 as $2.2 million.  She did not know the value of the property at the time of trial because she said it needed repairs.  Nasiri also claimed an apartment building on West 103rd Street was her separate property, but did not know the value of the property because it also needed repairs. However, she agreed that she valued the property at $1.1 million in 2021.  Creal also asked about several other properties in which Nasiri claimed an interest, but Nasiri testified she did not know the value of the properties.  Creal also questioned Nasiri about various posts from her Instagram profile in which she was wearing jewelry.  When confronted with the retail price of the jewelry, Nasiri claimed the jewelry was "fake."

Creal also questioned Nasiri about her interest in various businesses.  Nasiri claimed her dental practice was community property but did not know the value of the business.  Nasiri also claimed that she had a community interest in her husband's car washes, but again did not know their estimated value or how

much money each business was generating monthly. In her 2017 schedule of assets, Nasiri listed the car washes' value at $6 million and $3.5 million. Nasiri also testified she had borrowed $750,000 from one person, who held a lien on one of the residential properties. Nasiri stated she was no longer working full time because of an injury that required surgery. She also testified that she was in debt $3.7 million because of loans and attorney fees.

## IV. Trial court's findings

The trial court made the following findings. Creal had been a practicing CPA for more than forty years and his family had a long-standing accounting practice. Creal became familiar with Nasiri after he was retained as an expert for Nasiri's estranged husband in their divorce proceedings.

Historically, Creal's firm had an annual growth rate of 11 percent, but this stalled when Nasiri began defaming Creal in October 2017. The trial court found, "Nasiri undertook an unflinching campaign against Creal, calculated to severely damage his reputation and diminish him financially." It described Nasiri's animus as "particularly alarming" given her limited interaction with Creal. It noted Nasiri's anger stemmed from "her perception of Creal's involvement in filing a tax return for her husband, which led to him receiving money from the IRS to which she believe[d] he [wa]s not entitled." Despite this limited interaction, Nasiri's public accusations went "far afield" from what occurred, "accusing Creal of fraud, conspiracy, harassment, stalking, and even falsely inferring that he has a felony conviction." The trial court described Nasiri as "unhinged" and found that it was Nasiri who harassed Creal in a "deliberate effort[] at shaming and injuring him and his business."

11

The trial court found a correlation between the diminished growth of Creal's business and Nasiri's defamatory actions. Creal demonstrated Nasiri's posts emotionally impacted Creal in the form of continuous stress, anxiety, shame, frustration, loss of pride and dignity from a diminished reputation. "Even if Nasiri believes Creal had somehow wronged her (which he had not) her inordinate actions taken to inflict pain upon him grossly exceed the harm she accused him of doing. Her vehemence and need for retribution demonstrates an unhealthy fixation with Creal in her crosshairs."

The trial court awarded Creal $1,318,000 in special damages. These were calculated based on lost profits and reduction in the growth of Creal's business that began in 2018 following Nasiri's postings. Based on Creal's profit and loss statements, the trial court awarded damages to the firm of $345,000 for the years of 2018 and 2019 and future loss profits of $973,000 for a total of $1,318,000.

The trial court awarded Creal $250,000 in general damages for his loss of reputation, shame, mortification, and hurt feelings. "Nasiri's defamatory postings were readily accessible to the public as they were widely published on several sites on the internet. She generated many postings over time and most remained publicly visible for years. Any person doing a casual internet search—including existing and prospective clients of Creal—could see her comments and pictures." It found the "tone and tenor of Creal's testimony comport[ed] with an individual who has been severely mortified, shamed and hurt without lawful opportunity for any recourse other than this court's ruling."

The trial court awarded Creal $30,000 in punitive damages. It based its award on the fact that Nasiri was a practicing

12

dentist, her ownership of several homes in exclusive areas, and her claim that she held in a community interest in her ex-husband's car wash businesses worth millions of dollars each. The trial court also disbelieved Nasiri's testimony that the expensive designer jewelry she was seen wearing was fake. The trial court found Nasiri's net worth was at least eight million dollars. Further, it found that Creal had proven by clear and convincing evidence that Nasiri acted with malice and oppression and that punitive damages were necessary given Creal's damages were attributable to Nasiri's own despicable conduct.

The trial court denied Nasiri's motion for a new trial.

## V.     Attorney fee award

Creal moved for attorney fees under Code of Civil Procedure[1] section 2033.420, which allows a party to move for attorney fees if the other party "fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter." (*Id.*, subd. (a).)

Creal directed the trial court to a number of requests for admissions that Nasiri denied or gave equivocal responses. These requests asked Nasiri to admit:  she made a false statement; Creal never represented Nasiri as an accountant or performed work on her behalf; Creal only performed work for Nasiri's ex-husband; Nasiri falsely claimed Creal manipulated her tax return; Creal never took a 20 percent fee; Nasiri had no basis to accuse Creal of fraud; the statement that Creal was

---

[1]     All further undesignated statutory references are to the Code of Civil Procedure.

13

helping two businesses create unreported income was false; Nasiri falsely accused Creal of following her to her attorney's office; Nasiri falsely accused Creal of covering cameras to hurt her; Creal did not touch or damage Nasiri's car at any time; Creal did not harass or threaten Nasiri or cover up surveillance cameras; Creal did not have a fiduciary duty to Nasiri; Creal never concealed or diverted profits from various businesses; and Creal never fabricated or manipulated accounting records. Creal claimed Nasiri's responses made it necessary to conduct further discovery and motion work to prove their truth at trial.

The trial court determined Creal was entitled to attorney fees, finding the information contained in Creal's requests for admission were uniquely within Nasiri's knowledge to admit or deny without the need of discovery or testimony from another party.

Nasiri filed two separate appeals. In her first appeal, Nasiri challenged the judgment and order denying her motion for new trial. In her second appeal, Nasiri challenged the attorney fee award. We consolidated the appeals for purposes of decision.

## DISCUSSION

Nasiri makes several challenges on appeal. First, Nasiri asserts the trial court erred by issuing evidentiary sanctions against her for her counsel's failure to file certain pretrial documents in conformance with the trial court's pretrial order. Second, Nasiri argues the special damages award based on Creal's lost profits must be vacated because it was speculative and unsupported by substantial evidence. Third, Nasiri argues the general damages award must be vacated because there was no proximate cause between Nasiri's conduct and any emotional harm to Creal. Fourth, she argues the punitive damages award must be reversed because it was based on speculative evidence and inadmissible hearsay. Fifth,

14

she argues the trial court erred in not granting her a new trial on punitive damages based on newly discovered evidence. Sixth, she argues the attorney fee award must be vacated because she had reasonable grounds to deny Creal's requests for admission.

## I. Sanctions

Nasiri argues the trial court erred in imposing sanctions against Nasiri personally because her counsel, not Nasiri, failed to comply with the trial court's deadlines in filing her pretrial documents, including motions in limine, oppositions to Creal's motions in limine, jury instruction requests, or a joint exhibit list.

### A. Additional background

Nasiri initially represented herself until she retained a lawyer approximately five months before the initial trial date set for July 24, 2019. It appears the trial court continued the trial date on its own motion to November 20, 2019 after the parties entered into a stipulation to continue trial to a date no later than November 30, 2019 to accommodate Nasiri's counsel, who had just come into the case.

On October 21, 2019, one month before the trial date, Nasiri's counsel, Paul Carter, applied to be relieved as counsel due to a material breakdown in the attorney-client relationship. Carter stated there was "a breakdown in their attorney client relationship which is affecting all aspects of defense counsel's representation." He explained Nasiri had obtained new counsel, Hector Marrache, but Marrache would only substitute in if the trial court continued the November 20, 2019 trial date. The trial court denied the application without prejudice for renewal if Marrache actually substituted into the case. Once Marrache substituted in, the trial court continued the trial to February 13, 2020.

15

On January 28, 2020, Marrache applied ex parte to be relieved as counsel. Like Carter, Marrache claimed there was a "breakdown of the attorney-client relationship that makes the continued and effective representation of . . . Nasiri unreasonably difficult." Like Carter, Marrache explained that Nasiri had obtained new counsel, but they were concerned with the timing of the trial and their substitution into the case.

On January 31, 2020, the parties filed a joint witness list. Creal also filed a motion to preclude Nasiri's expert testimony, a proposed exhibit list, a statement of the case, and a trial brief. Nasiri's counsel filed a statement to be read to the jury.

On February 3, 2020, the trial court granted Marrache's request to be relieved. On February 5, 2020, Nasiri, again in pro. per., applied ex parte for a continuance on the grounds her new counsel needed time to prepare for trial. Creal opposed the continuance, arguing Nasiri exhibited a pattern of changing counsel within a month of the trial date and then finding new counsel to substitute in only if the trial court were to grant a continuance.

On February 6, 2020, the trial court held a final status conference and denied the ex parte application to continue without prejudice. However, the trial court allowed Nasiri to renew the application if she obtained counsel of record. At the hearing, Nasiri's new counsel appeared in a limited scope, and requested a continuance because he had recently been retained. The trial court denied the request but continued the status conference on its own motion to February 18, 2020. The trial court also inquired whether the parties had filed their trial documents. Creal's counsel informed the trial court it had filed various trial documents but Nasiri and her counsel had failed to

16

meet and confer; therefore, the documents were not joint documents. In response, the trial court issued an order to show cause why monetary or evidentiary sanctions should not be imposed on Nasiri and set the matter for hearing at the final status conference.

On February 14, 2020, Nasiri applied for a continuance on the grounds she could not represent herself and was still trying to retain counsel.

On February 18, 2020, Nasiri's new counsel substituted in and requested a continuance. The trial court stated trial could not occur that day because it was engaged in another matter. After the parties met and conferred, the trial court continued the trial to May 6, 2020. Regarding the order to show cause, Nasiri's counsel argued Nasiri should not be penalized by Marrache's actions, and Creal would not suffer prejudice if Nasiri could oppose Creal's motions in limine, file her own motions in limine, and add exhibits material to her defense. Creal asserted sanctions were appropriate because Nasiri had not complied with the trial court's deadlines, and that he had tried to meet and confer with Nasiri regarding the joint trial documents to no avail. Creal argued Marrache had been relieved on February 3, and that Nasiri could have filed her own documents between then and February 18 or filed a response to the order to show cause. Creal further argued he would be prejudiced because Nasiri sought to add exhibits which had not been produced in discovery, and Nasiri should not be granted additional time to oppose motions in limine.

The trial court found Nasiri had failed to comply with the pretrial requirements, and ordered that the pretrial cutoffs, including motions and discovery, would not be extended.

17

It further ordered no new witnesses or exhibits could be added to the lists; no new jury instructions could be proposed; no new motions in limine could be filed; and existing motions in limine could not be opposed if that had not been done already.

Nasiri moved for reconsideration of the sanctions order. Nasiri voluntarily withdrew that motion four months later before receiving a ruling.

On April 9, 2020, the trial court vacated the final status conference due to COVID. The trial court set a trial setting conference for June 24, 2020. On June 24, 2020, the court scheduled trial for December 2, 2020, and a new final status conference for November 18, 2020.

On August 10, 2020, Nasiri filed a section 473 motion to vacate the February 18, 2020 order. The motion argued that Marrache failed to handle pretrial matters prior to leaving the case, which was excusable neglect. Marrache provided a declaration, detailing his work in January and February 2020 and his belief the final status conference would be continued. Nasiri sought to present additional documentary evidence at trial, including proof she had paid the IRS the $65,000 at issue, her former husband's schedule of assets and debts, tax returns, and bad Yelp reviews from third parties.

The trial court denied the motion on the grounds that it was untimely and that Marrache's failure to comply with the pretrial requirements did not constitute excusable neglect.

On November 12, 2020, Nasiri applied again to vacate the sanctions order, which the trial court denied.

## B. Section 575.2

Nasiri argues the trial court erred in issuing the sanctions because the failure to comply with the final status conference

18

order was attributable to Marrache, not Nasiri herself.  Further, she argues the trial court had a sua sponte duty to apply section 575.2, subdivision (b), which prohibits sanctioning an innocent party for the conduct of their counsel.

"The Legislature has authorized superior courts to promulgate local rules and to impose sanctions for local rule violations.  Specifically, section 575.1 broadly authorizes superior courts to enact local rules 'designed to expedite and facilitate the business of the court.' " (*Shiheiber v. JPMorgan Chase Bank, N.A.* (2022) 81 Cal.App.5th 688, 695 (*Shiheiber*), quoting § 575.1, subd. (a).)

"In turn, section 575.2 contains an enforcement mechanism.  It states in relevant part:  'Local rules promulgated pursuant to Section 575.1 may provide that if any counsel, a party represented by counsel, or a party if in pro se, fails to comply with any of the requirements thereof, the court on motion of a party or on its own motion may strike out all or any part of any pleading of that party, or, dismiss the action or proceeding or any part thereof, or enter a judgment by default against that party, or impose other penalties of a lesser nature as otherwise provided by law, and may order that party or his or her counsel to pay to the moving party the reasonable expenses in making the motion, including reasonable attorney fees.' " (*Shiheiber*, *supra*, 81 Cal.App.5th at p. 695, quoting § 575.2, subd. (a), italics omitted.)  "At the same time, section 575.2 precludes an award of sanctions against an innocent client.  Section 575.2, subdivision (b) states:  'It is the intent of the Legislature that if a failure to comply with these rules is the responsibility of counsel and not of the party, any penalty shall be imposed on counsel and

19

shall not adversely affect the party's cause of action or defense thereto.' " (*Shiheiber*, at p. 695, quoting § 575.2, subd. (b).)

"Trial courts must balance the 'opposing responsibilities' of 'actively assum[ing] and maintain[ing] control over the pace of litigation' and 'abid[ing] by the guiding principle of deciding cases on their merits rather than on procedural deficiencies.' [Citation.]  Decisions implicating both responsibilities 'must be made in an atmosphere of substantial justice.  When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency.' " (*In re Harley C.* (2019) 37 Cal.App.5th 494, 508.)

We review an order for sanctions for abuse of discretion. (*Pollock v. Superior Court of Los Angeles County* (2023) 93 Cal.App.5th 1348, 1358; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364.)  " '[A] trial court's exercise of discretion will not be disturbed unless the record establishes it exceeded the bounds of reason or contravened the uncontradicted evidence [citation], failed to follow proper procedure in reaching its decision [citation], or applied the wrong legal standard to the determination [citation].' [Citation.]  A discretionary ruling will not be reversed merely because of a difference of opinion between the appellate tribunal and the trial judge." (*Conservatorship of Becerra* (2009) 175 Cal.App.4th 1474, 1482.)  "[W]e may properly evaluate the record to determine if it contains substantial evidence to support the trial court's factual findings on sanctions. [Citation.]  Absent a proper basis for those findings, a sanctions award represents a prejudicial abuse of discretion." (*Id.* at pp. 1481–1482.)

20

Nasiri argues the sanctions order was an abuse of discretion because there was no evidence that Nasiri, as opposed to her counsel, was responsible for the timely filing of the various trial documents.  Nasiri directs us to the Superior Court of Los Angeles County, Local Rules, rule 3.25(f)(1), which places responsibility on counsel to get the preliminary trial documents.  Similarly, the trial court's minute order directed "parties/counsel" to prepare joint trial documents and file pretrial motions.  Accordingly, Nasiri asserts it was Marrache's responsibility to file joint pretrial statements, witness lists, jury instructions, motions, and oppositions.  In other words, Nasiri asserts she was an innocent party as contemplated by section 575.2 and therefore the evidentiary sanctions imposed against her were improper.

Assuming it was Marrache's responsibility to comply with the pretrial deadlines despite the fact that Nasiri was representing herself at the time the trial court imposed sanctions, there was evidence that Nasiri was not an innocent party with respect to that noncompliance.  The record shows a pattern of a breakdown in the attorney-client relationship between Nasiri and her counsel just before the case was supposed to go to trial.  Nasiri changed counsel multiple times throughout the litigation, and she had done so twice before trial was set to commence.  Further, in each instance, while Nasiri would eventually find new counsel, that new counsel would refuse to substitute in if the trial court refused to grant a continuance.  This pattern was sufficient grounds for the trial court to impose sanctions against Nasiri.

Further, section 575.2 does not preclude "the trial court in a proper case from looking behind the conduct of an attorney to determine if responsibility for noncompliance rests with the client." (*In re Marriage of Colombo* (1987) 197 Cal.App.3d 572,

21

578–579.) Based on Nasiri's pattern of conduct, the trial court could reasonably conclude the fault to comply with its pretrial requirements rested, at least in part, with Nasiri based on her repeated failure to cooperate with counsel. This was not an abuse of discretion.

### C. Section 473

Nasiri argues the trial court erred in denying her section 473 motion because her counsel's failure to comply with the pretrial deadlines was due to excusable neglect. We disagree.

" '[A] trial court order denying relief under section 473, subdivision (b) is " 'scrutinized more carefully than an order permitting trial on the merits.' " [Citation.] "Because the law favors disposing of cases on their merits, 'any doubts in applying section 473 must be resolved in favor of the party seeking relief from default [citations].' " [Citation.] But that said, "[a] motion to vacate a default and set aside judgment [citation] 'is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse . . . the exercise of that discretion will not be disturbed on appeal.' [Citations.] Moreover, all presumptions will be made in favor of the correctness of the order, and the burden of showing abuse is on the appellant." ' " (*McClain v. Kissler* (2019) 39 Cal.App.5th 399, 413 (*McClain*).)

" 'The standard for appellate review of an order denying a motion to set aside under section 473 is quite limited. A ruling on such a motion rests within the sound discretion of the trial court, and will not be disturbed on appeal in the absence of a clear showing of abuse of discretion, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice. Where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its

judgment of the correct result for the decision of the trial court.' " (*McClain*, *supra*, 39 Cal.App.5th at p. 414.)

"To obtain discretionary relief under section 473, the moving party must show the requisite mistake, inadvertence, or excusable neglect." (*McClain*, *supra*, 39 Cal.App.5th at p. 414.) " 'A party who seeks relief under section 473 on the basis of mistake or inadvertence of counsel must demonstrate that such mistake, inadvertence, or general neglect was excusable because the negligence of the attorney is imputed to his client and may not be offered by the latter as a basis for relief.' [Citation.] In determining whether the attorney's mistake or inadvertence was excusable, 'the court inquires whether "a reasonably prudent *person* under the same or similar circumstances might have made the same error." ' [Citation.] In other words, the discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made.' [Citation.] 'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable. To hold otherwise would be to eliminate the express statutory requirement of excusability and effectively eviscerate the concept of attorney malpractice.' " (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 258.)

Here, Nasiri's former counsel provided a declaration, explaining his failure to comply with the trial court's pretrial deadlines. He declared that the attorney-client relationship had begun to breakdown in early January 2020. At some point, he was no longer communicating with Nasiri, but through her new counsel. During the latter part of January 2020, he worked with Nasiri's new counsel in getting all joint trial documents ready for

23

filing. He spent a substantial amount of time going through the file, especially evidentiary documents for the list of exhibits, as well as reviewing all of the discovery, prior pleadings, and gathering information regarding witnesses for the defense. He neglected to file oppositions to Creal's motions in limine because his "focus was primarily on getting the other trial documents, especially the witness list and exhibits list, ready for filing." He stated: "There was a lot of movement in the case in January with coordinating expert depositions; meeting and conferring with defense experts; preparation for those depositions; going through hundreds of new documents produced by [Creal] on January 9, 2020; waiting for expedited transcripts from depositions needed by defense experts to be reviewed and analyzed prior to those experts' depositions; the MSC; breakdown in the attorney-client relationship; and coordinating document preparation with [Nasiri's] 'new' attorneys. In addition, my office staff was working in the background on coordinating, setting, and confirming expert depositions, court reporters, obtaining missing depositions [from] the file, gathering and assembling documents for the experts to review, etc."

Based on this explanation, we find the trial court was well within its discretion in finding former counsel's neglect was not excusable. Essentially, he claimed his failure to prepare the pretrial documents was due to being overwhelmed with trial preparation and there was some confusion coordinating with Nasiri's new counsel about who would do what. However, the " 'press of business' alone generally does not constitute grounds for relief." (*Huh v. Wang* (2007) 158 Cal.App.4th 1406, 1423.) "To constitute grounds for relief, an exceptional workload generally must be accompanied by some factor outside the

24

attorney's control that makes the situation unmanageable, such as a mistake 'caused by a glitch in office machinery or an error by clerical staff.' [Citations.] Other such factors might include extraordinary changes in the law firm." (*Ibid.*) Here, the other factor identified by Nasiri's former counsel was his inability to coordinate with new counsel. However, his inability to communicate and properly coordinate with new counsel was not outside of his control. Indeed, other parts of his declaration demonstrate he was communicating with new counsel on other matters related to trial preparation.

Therefore, the trial court did not err in finding Nasiri's former counsel's neglect was not excusable.

## II.     Challenges to the damages award

Nasiri makes various challenges to the trial court's damages award. First, Nasiri argues the trial court erred in overruling objections to Creal's expert's testimony regarding Creal's claimed lost profits because the testimony was speculative and unsupported by substantial evidence. Second, she argues there was no substantial evidence that Creal's general damages were proximately caused by Nasiri's conduct. Third, she argues the punitive damages award was unsupported by substantial evidence and that the evidence should have been excluded as speculative hearsay without foundation.

### A.     Lost profits

Nasiri asserts the special damage award of $1,318,000 was based entirely on the diminished growth of Creal's business and reduction in growth of business profit. Nasiri argues Creal's damages were improperly based on a " 'contemplated extension of his business,' " which was too speculative and remote. She acknowledges that although a claim can be based on past profits,

25

it cannot be based on speculation business would increase in the future.  We disagree.

" '[T]he loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' [Citation.]  Such damages must 'be proven to be certain both as to their occurrence and their extent, albeit not with "mathematical precision." ' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774 (*Sargon*).)  "Lost profits need not be proven with mathematical precision, but they must also not be unduly speculative."  (*Id.* at p. 753.)

"Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses.  '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.'  [Citation.]  'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision.  [Citations.]  Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits.  [Citations.]  In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions.' " (*Sargon*, *supra*, 55 Cal.4th at p. 774.)

The record shows this was the exact type of evidence Creal produced to support his claim of lost profits. As an established business, Creal presented evidence of historical data, past business volume, client retention rates, and a comparison with other similar businesses in the form of a national study that showed other accountancy firms continued to grow at a similar rate to what they had in prior years. Creal used this data to show the amount of profits to be expected in the future, and included a reduction for saved costs due to handling less business and a reduction to present value. Creal also testified that there were no changes in his firm such as the services offered or changes in staff. While Creal's resulting calculation of lost profits was inherently speculative as there was no way of proving the actual number of potential new clients that were deterred by Nasiri's internet posts, a certain amount of speculation was permissible and Creal supplied substantial evidence in support of his calculation. (*Sargon*, *supra*, 55 Cal.4th at p. 775.)

Nasiri also argues that Creal's evidence of an average 11.7 percent growth rate was speculative. However, as we have just stated and as our Supreme Court has acknowledged, "[t]he lost profit inquiry is always speculative to some degree." (*Sargon*, *supra*, 55 Cal.4th at p. 775.) "Inevitably, there will always be an element of uncertainty. Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been. Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative. A reasonable certainty only is required, not absolute certainty." (*Ibid*.)

27

Nasiri cites to *Kuffel v. Seaside Oil Co.* (1970) 11 Cal.App.3d 354 (*Kuffel*) in support of her argument that Creal's claimed 11.7 percent annual growth rate was unduly speculative. In *Kuffel*, the plaintiffs operated a gas station and entered into an exclusive supply agreement with the defendant to sell defendant's brand of gasoline. (*Id*. at pp. 358–359.) The plaintiffs sued to recover lost profits after the defendant fraudulently induced them to terminate the agreement. (*Id*. at p. 360.) The Court of Appeal reversed the damages award in favor of plaintiffs because their calculation of lost profits was grossly erroneous and based on several unwarranted assumptions. (*Id*. at p. 365.) It found the plaintiffs failed to consider market conditions and similar factors, assuming they would have sold as much gasoline following the termination of the contract as they sold before. (*Ibid*.) The plaintiffs also ignored potential population and traffic changes, future road layouts and efficient business management, all of which are principal factors responsible for the growth of a retail gasoline business, and instead, relied solely on their own testimony to calculate the increases and the decreases in the sale of gasoline during the seven-year period immediately preceding the termination of the contract. (*Id*. at p. 366.) They also assumed that they would have increased their annual gasoline output without considering any increases in overhead expenses. (*Id*. at p. 367.)

The same evidentiary shortcomings in *Kuffel* are not present here. Creal's expert's opinion was based not only on Creal's revenue history, but also on comparisons with other accountancy firms during the same period. He also factored in Creal's client retention rate, which was consistent with the

28

industry. Further, Creal's expert factored in the saved costs that would have been incurred due to an increase in business. He also reduced the lost profits calculation to present value.

Nasiri also claims the special damages award must be vacated because Creal did not demonstrate that the special damages were proximately caused by Nasiri's conduct. She directs us to the absence of evidence that any particular individual saw her posts.

While we agree with Nasiri that there was no direct evidence from Creal that any particular member of the public saw Nasiri's posts, Creal provided circumstantial evidence that the posts were viewed, and that the posts had a negative impact on Creal's business. Creal's expert explained that Nasiri's posts could be viewed by any individual who conducted an internet search of Creal's name, and that the number of searches for Creal and his firm had increased over several years. However, in spite of this increase in searches, the number of Creal's new clients declined. He opined that he would have expected an increase in new clients based on the increased number of internet searches. However, because the number of new clients actually decreased after Nasiri's posts, it was reasonable to conclude that the posts negatively deterred new clients from engaging Creal's firm. Further, Creal presented evidence that other factors, such as a change in the economy, a change in services, or the loss of a large client, were not responsible for the firm's stall in growth.

Accordingly, we find the special damages award was not unduly speculative and was supported by substantial evidence.

**B.    General damages**

Nasiri argues the award of $250,000 general damages is unsupported by substantial evidence. She asserts Creal was

required to demonstrate the $250,000 damage award was proximately caused by a loss of reputation, shame, or injured feelings; however, Creal offered no testimony of any serious physical reactions or emotional damage.  We are not persuaded by Nasiri's argument as the trial court properly inferred from Creal's testimony that he suffered emotional damage.  Further, because the trial court found Nasiri committed defamation per se, Creal was not required to prove actual damages.

When a plaintiff prevails on a claim of defamation per se, the plaintiff need not prove actual damages because damages are presumed.  (*Tilkey v. Allstate Insurance Company* (2020) 56 Cal.App.5th 521, 542 (*Tilkey*); *Finney v. Lockhart* (1950) 35 Cal.2d 161, 163.)

Here, the trial court properly concluded that Nasiri's statements constituted defamation per se, i.e., "the meaning is so clear from the face of the statement that the damages can be presumed." (*Tilkey*, *supra*, 56 Cal.App.5th at 542.)  Nevertheless, the trial court also found that Creal actually did suffer some emotional damage based on the "tone and tenor" of Creal's testimony.  Specifically, the trial court found that Creal's testimony "comport[ed] with an individual who has been severely mortified, shamed and hurt without lawful opportunity for any recourse other than this court's ruling."  Thus, even though Creal was not required to prove actual damages, the record demonstrates he did so in any event.

Nasiri acknowledges that damages may be presumed in a defamation case; however, she asserts this applies only to nominal damages.  The authorities cited by Nasiri do not support this assertion.  In *Contento v. Mitchell* (1972) 28 Cal.App.3d 356, the court explained:  "Where the trier of fact has found the

30

existence of slander per se, and has found the requisite malice in fact, an award of punitive damages is proper despite the absence of a specific award of nominal damages." (*Id.* at p. 359.) That is not the issue here as the trial court found that Creal was entitled to both general and special damages. In *Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, the plaintiff proceeded on a slander per quod theory, which required the plaintiff to prove actual damages. (*Id.* at p. 370.) Here, Creal proved that Nasiri's statements were defamation per se; therefore, he was not required to prove actual damages. General damages are conclusively presumed to result from a statement that is libelous per se; the plaintiff need not introduce evidence of actual damages to obtain an award of damages. (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 382.)

### C. Punitive damages

Nasiri argues the award of punitive damages must be vacated because it was unsupported by substantial evidence, and the evidence offered in support should have been excluded as speculative hearsay without exception.

We review the trial court's decision to admit or exclude evidence for abuse of discretion. We review whether the judgment was supported by the evidence under the substantial evidence standard. (See *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 451; *Dumas v. Stocker* (1989) 213 Cal.App.3d 1262, 1266 (*Dumas*).) "An important consideration in assessing punitive damages is the net worth of the defendant. [Citation.] The award must bear some reasonable relationship to the net worth of the defendant, and where the award is grossly disproportionate to the defendant's wealth, a presumption arises

31

that it was the result of passion and prejudice." (*Dumas*, at p. 1267.)

Nasiri argues the trial court allowed Creal to establish the estimated value of her interests in real property by improperly presenting figures from the website Zillow that contained the purported value of each property. She also argues Creal could not rely on family law filings, specifically, the schedule of assets that Nasiri signed under penalty of perjury. We find these arguments do not warrant reversal of the punitive damage award.

First, there is no indication in the record that the trial court relied on the Zillow estimates to determine Nasiri's net worth. Rather, the trial court stated it was relying on the family law filings. Further, whatever the Zillow estimates may have been, the fact remained that Nasiri admitted to having an interest in numerous pieces of real property in exclusive areas. It was reasonable for the trial court to infer that based on Nasiri's claimed interest, her net worth was substantial relative to the amount of punitive damages awarded.

Second, to the extent Nasiri claims the trial court improperly relied on her family law filings, in which Nasiri claimed to have an interest in these properties, Nasiri's own admissions during her testimony established that she held an interest in these properties.

Thus, the trial court's findings regarding Nasiri's estimated net worth were supported by substantial evidence.

### III. Motion for new trial on punitive damage award

Nasiri argues the trial court erred in denying her motion for a new trial based on new evidence concerning her net worth. Nasiri submitted evidence of a family court ruling issued after

the trial in this case concluded. In that ruling, the family court found that the two car wash businesses were Nasiri's husband's separate property. This ruling conflicted with the trial court's finding that Nasiri and her husband co-owned the car washes, which were valued at $9.5 million. Because the trial court partly calculated the punitive damage award based on the significant value of these car washes, Nasiri asserts the trial court should have granted her new trial motion on this ground.

" 'A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal.' " (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 119.) "The trial court's determination on a motion for a new trial will not be disturbed on appeal absent a showing of a manifest and unmistakable abuse of discretion." (*Wood v. Jamison* (2008) 167 Cal.App.4th 156, 162.) Further, when a motion for new trial is based on newly discovered evidence, the evidence must be material, i.e., "it is likely to produce a different result." (*Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 327.)

Here, the trial court found that the new evidence consisting of the family court's finding that the car washes claimed by Nasiri as community property were actually her ex-husband's separate property was not material to its award of punitive damages. As the trial court correctly noted, the family court made no findings about Nasiri's net worth as of December 2021, when the punitive damages were awarded in favor of Creal. Further, the family court was presented with different evidence by different parties than what was before the court here. Moreover, an examination of the family court's ruling demonstrates it found Nasiri's community and separate property

33

interests were still substantial and that Nasiri was still making considerable income. We also find the trial court properly disregarded the family court ruling in that it made no effort to value all separate property holdings and the evidence presented was wanting, inconclusive, or lacked credibility in many respects, leaving the family court to conclude valuations were only sparsely supported.

Accordingly, we find the trial court did not abuse its discretion in denying Nasiri's motion for a new trial based on new evidence.

## IV. Attorney fees

Nasiri argues the attorney fee award must be vacated because she had reasonable grounds to deny the requests for admission that were the basis of Creal's attorney fees motion. Creal responds that Nasiri's appeal of the attorney fee award is untimely. We agree with Creal.

### A. Additional background

On March 11, 2022, the trial court issued its award of damages in favor of Creal. The judgment was filed on March 30, 2022. The judgment indicated that Creal "may also be entitled to recover attorneys' fees in accordance with [section] 2033.420 in an amount to be determined following the filing of a motion for attorneys' fees." Thereafter, Nasiri filed her notice of appeal on July 8, 2022. Nasiri's notice of appeal indicated that she was appealing from the March 30, 2022 judgment and the trial court's denial of her motion for new trial.

On May 4, 2022, Creal moved for attorney fees under section 2033.420. The trial court granted that motion on October 12, 2022, and Nasiri was served with a notice of order awarding attorney fees on October 14, 2022. On October 25,

34

2022, the trial court filed an amended judgment, which was served on Nasiri on November 3, 2022. Nasiri attempted to file her notice of appeal from the attorney fee award on December 14, 2022. Her notice of appeal indicated she was appealing from the October 25, 2022 amended judgment. Her notice of appeal was rejected on December 20, 2022, and again on December 23, 2022 after an attempt to refile. Nasiri's appeal was ultimately accepted on January 6, 2023.

We consolidated Nasiri's two appeals and deferred our decision on whether her second appeal was timely.

## B. Nasiri's second appeal was untimely

A party has 60 days from the date he or she is served by a party with "a document entitled 'Notice of Entry' of judgment." (Cal. Rules of Court, rule 8.104(a)(1)(B).) The word " 'judgment' " includes "an appealable order if the appeal is from an appealable order." (*Id*., rule 8.104(e).) Under section 904.1, subdivision (a)(2), postjudgment orders granting or denying motions for attorney fees are deemed to be appealable. (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1015.) "It is well settled . . . that '[w]here the judgment is modified merely to add costs, attorney fees and interest, the original judgment is not substantially changed and the time to appeal it is therefore not affected.' " (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222.)

Here, Nasiri was served with notice of attorney fees order on October 14, 2022; therefore, the 60-day deadline to file her notice of appeal from that order was December 13, 2022. Disregarding any technical difficulties Nasiri may have had in filing her notice of appeal, resulting in it being received on January 6, 2023, her notice of appeal was still filed one day late

35

on December 14, 2022.  Therefore, her appeal was untimely. " '[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction.' " (*K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 881.)

Further, we reject Nasiri's argument that her appeal from the first judgment was sufficient to confer jurisdiction on the issue of whether Creal was entitled to attorney fees under section 2033.420 as that issue had not yet been decided by the trial court, which specifically reserved the decision for further briefing and determination.

## DISPOSITION

The judgment and postjudgment orders are affirmed. Respondents shall recover their costs on appeal.


VIRAMONTES, J.

WE CONCUR:


STRATTON, P. J.


GRIMES, J.

36